**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:12-cv-21656-JAL**

| | |
|---|---|
| **SECURITIES AND EXCHANGE** | ) |
| **COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **RECYCLE TECH, INC.,** | ) |
| **RYAN GONZALEZ,** | ) |
| **OTC SOLUTIONS LLC,** | ) |
| **ANTHONY THOMPSON,** | ) |
| **PUDONG LLC, and JAY FUNG,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

**STATEMENT OF MATERIAL FACTS**

**A. Formation of Green Building and Reverse Merger with Recycle Tech**

1.      On January 19, 2010, a week after Haiti's catastrophic earthquake, Defendant Kevin Sepe arranged for his nephew's fishing buddy, Defendant Ryan Gonzalez, to incorporate a private company, Green Building & Engineering Contractors ("Green Building").  (Ex. 1 at #1; Ex. 2; Ex. 3 Gonzalez Nov. 4, 2010 Testimony Tr. at p 48, lines 6-15; p 92, line 25 – p 93, line 4; p 96, lines 14-24).

2.      Green Building was purportedly a builder of home container units, in the business of converting shipping containers into cost-effective, eco-friendly, hurricane and seismic resistant, mobile shelters, ready to be shipped anywhere in the world.  (Exs. 4-10).

3.      Green Building had no operations, customers, products, sales, or revenues.  (Ex. 1 at #4 and 7; Ex. 3 Gonzalez Nov. 4, 2010 Testimony Tr. at p 62, lines 11-25; p 105, lines 12-25;

Ex. 11 Rojas Deposition Tr. at p 122, lines 10-15; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 235, lines 15-17; p 236, line 11 - p 237, line 5;  p. 238, lines 4-5).

4.      Green Building never manufactured, sold, or delivered any eco-friendly home container units.  (Ex. 3 Gonzalez Nov. 4, 2010 Testimony Tr. at p 62, lines 11-21; p. 105, lines 12-25; Ex. 11 Rojas Deposition Tr. at p. 122, lines 10-15; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 235, lines 15-17; p. 236, line 11 – p. 237, line 5; Ex. 1 at 4 and 8).

5.      Green Building had two part-time employees, Gonzalez and his aunt, who were also its sole officers. (Ex. 1 at #8).

6.      Green Building's assets consisted of a set of tools worth approximately $5,000 and three partially completed prototypes used to tout the purported product to prospective investors. (Ex. 3 Gonzalez Nov 4, 2010 Testimony Tr. at p 44, lines 8-25; p 45, lines 6-10; p 134, lines 14-18; p 135, lines 9-21; Ex. 13 at #14).

7.      Sepe and Defendant Ronny Halperin engaged Belmont Partners, LLC ("Belmont Partners"), a self-proclaimed "leading provider of public shell companies for reverse merger transactions," to provide a suitable public shell company into which to reverse merge Green Building and bring it public.  (Ex. 14; Ex. 15; Ex. 16 Nov. 27, 2013 Declaration of Hadi Aboukhater at 5 - 7; Ex. 17 Meuse Testimony p 42, line 3 – p 49, line 19).  They agreed upon Recycle Tech, a public shell company with no or minimal operations and a small amount of debt. (Ex 18; Ex. 17 Meuse Testimony p 42 line 3 – p 49, line 19).

8.      Before obtaining the Recycle Tech shell, Belmont Partners contacted Defendant David Rees, an attorney, and his associate to ascertain whether Rees would convert Recycle Tech's debt into purportedly unrestricted shares and issue an opinion to that effect.  (Ex 19).

9.     After Rees confirmed that he would convert the debt into stock and issue a legal opinion, Belmont Partners referred Rees's law firm to Halperin.  (Ex 19, 20).

10.     As late as January 11, 2010, Defendant Anthony Thompson, along with Defendant Jay Fung and another penny stock promoter, contemplated buying the Recycle Tech shell themselves.  (Exs. 21-24; Ex. 25 Eric Van Nguyen Testimony Tr. at p 150, line 25 - p 151, line 17; Ex. 26 Marlow Deposition Tr. at p 106, line 18 – p 107, line 7; p 108, line 9 – p 109, line 7).

11.     Ultimately, on January 28, 2010 Belmont Partners purchased the majority of Recycle Tech's stock and Belmont Partners' founder and president, Joseph Meuse, replaced the then Recycle Tech officers as sole officer.  (Ex. 27).

12.     On February 16, 2010, Sepe, Halperin, and Gonzalez completed the purchase of Recycle Tech from Belmont Partners, the professional shell provider.  (Ex. 18).

13.     As a result, Green Building became the owner of the controlling majority of Recycle Tech's shares, thereby completing the reverse merger.  (Ex. 18).

14.     Gonzalez signed the Common Stock Purchase Agreement to effectuate the reverse merger of Recycle Tech with Green Building.  (Ex. 18).

15.     Recycle Tech and Gonzalez appointed an out of state transfer agent to deliver the stock in question out of state. (Exs. 28-31).

16.     Gonzalez was the CEO and President of Recycle Tech. (Ex. 1 at #3; Ex. 3 Gonzalez Nov. 4, 2010 Testimony Tr. at p 24, lines 23-25 and p 25, lines 1-8; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 50, lines 2-4).

17.     Recycle Tech has not filed a Form 10-K or 10-Q since January 13, 2010.  (Ex. 32).

B. __Penny Stock Promoters Retained and Given Free Trading Common Stock__

18.     At the same time, Sepe engaged penny stock promoters, including Thompson and Fung and their companies OTC and Pudong, to tout Recycle Tech stock through their various promotional newsletters. (Ex. 33 Thompson Testimony Tr. at p 37, lines 23-25; p 56, lines 1-2; Ex. 34 Thompson Deposition Tr. at p 258, lines 6-8; p 29, line 13 - p 31, line 1; Ex. 35 Gracin Deposition Tr. at p 46, lines 12-24; Ex. 36 at #4).

19.     Sepe promised each promoter, including Thompson and his company OTC, more than 2 million unrestricted shares of Recycle Tech stock as compensation. (Ex. 33 Thompson Testimony Tr. at p 48, lines 9-25; p 56, lines 11-13; Ex. 37 at #4; Ex. 93).

20.     Gonzalez signed a corporate resolution as CEO and Director of Recycle Tech issuing 2,325,000 free trading shares of Recycle Tech stock to OTC. (Ex. 38).

21.     In order to get the shares issued as unrestricted and free trading, OTC and Thompson used the opinion letter provided by Rees. (Ex. 39, Ex. 29).

22.     The opinion letter states that Rees assumed the genuineness of signatures and the authenticity of documents. (Ex. 39).

23.     Thompson signed a notice of conversion requesting that the debt OTC purportedly purchased from Sobnosky be converted to 2.325 million shares of Recycle Tech stock and delivered to his broker in New York. (Ex. 40; Ex. 34 Thompson Deposition Tr. at p 81, lines 10-15).

24.     Thompson entered into the Purchase and Assignment Agreement for OTC which purportedly assigned Recycle Tech's debt to OTC and others. (Ex. 41; Ex. 42).

25.     Neither OTC nor Thompson paid Brian Sobnosky any consideration for the shares they received. (Ex. 34 Thompson Deposition Tr. at p 81, lines 10-25, p 82, lines 1-8; Ex. 43

Sobnosky's Deposition Tr. at p 121, lines 1-25; p 122, lines 1-8).

26.     Neither Rees nor his associate who worked on the opinion letter verified the accuracy of the Sobnosky notes when issuing the opinion letter.  (Ex. 44 David Rees Testimony Tr. at p 47, lines 3-25; p 49, lines 1-23; Ex. 45 Chase Chandler Testimony Tr. at p 38, lines 12-20).

27.     Brian Sobnosky obtained only 1 promissory note from Recycle Tech. (Ex. 46, Ex. 47; Ex. 43 Sobnosky Deposition Tr. at p 111, lines 8-25; p 115, lines 9-25; p 118, lines 12-24, p 119, lines 3-16).

28.     The only promissory note Brian Sobnosky obtained from Recycle Tech was for $9,000. (Ex. 46, Ex. 47; Ex. 43 Sobnosky Deposition Tr. at p 101 -109).

29.     Although the promissory note is dated June 15, 2009, Sobnosky did not lend Recycle Tech any funds until the end of August 2009.  (Ex. 46; Ex. 48; Ex. 43 Sobnosky Deposition Tr. at p 112, lines 16-25; p 113, lines 1-24).

30.     Brian Sobnosky only lent Recycle Tech $3,500 by a check numbered 246 which is dated either August 26 or 29, 2009. (Ex. 48, Ex. 46, Ex. 49 at p 6; Ex. 43 Sobnosky Deposition Tr. at p 59, lines 17-25; p 60; p 101 – 109).

31.     Brian Sobnosky did not lend money to Recycle Tech in June of 2009.  (Ex. 46; Ex. 43 Sobnosky Deposition Tr. at p 112, lines 19-25; p 113, lines 1-24).

32.     Brian Sobnosky did not receive $34,000 in repayment of his note from Recycle Tech. (Ex. 46; Ex. 43 Sobnosky Deposition Tr. at p 121, line 1 -  p 122, line 8).

33.     Brian Sobnosky did not receive any funds from OTC or Thompson. (Ex. 43 Sobnosky Deposition Tr. at p 122, lines 5-8).

34.     Brian Sobnosky had no knowledge his note was being assigned. (Ex. 43 Sobnosky

Deposition Tr. at pp 120-121).

35.     Brian Sobnosky did not authorize his note being assigned to OTC among others. (Ex. 43 Sobnosky Deposition Tr. at p 121, lines 15-18).

36.     With Rees's opinion letter, Recycle Tech's transfer agent issued more than 25 million shares of stock to more than twenty assignees, including OTC.  (Ex. 29).

37.     There was no registration statement in effect permitting the issuance of more than 25 million Recycle Tech common stock shares.  (Exs. 50-51).

38.     Halperin wrote to Recycle Tech's transfer agent that they "desperately" needed OTC's and other stock promoters' stock certificates to be issued and sent out.  (Ex. 52).

### C. The "Pump" Begins With Recycle Tech's False and Misleading Press Releases

39.     Two days after the reverse merger was complete, with the penny stock promoters in place, Gonzalez drafted and issued seven press releases for Recycle Tech.  (Exs. 4-10; Ex. 1 at # 9, 11, 15, 16, 19, 20, 22, 23, 27, 28, 31, 32, 34, 35).

40.     Gonzalez drafted the press releases with the assistance of his hired public relations consultant.  He reviewed them, and authorized their release to the public.  (Ex. 3 Gonzalez Nov. 4, 2010 Testimony Tr. at p 123, lines 15-25; p 124, lines 19-24; p 126, lines 9 – p 127, line 1; p 128, lines 7 – p 129, line 2; p 130, lines 20 - p 131, line 10; p 142, line 18 – p 143, line 18; p 145, line 17 – p 146, line 13; p 150, line 14 – p 151, line 7; p 153, line 23 – p 154, line 11; p 155, lines 6-15; p 155, line 24 – p 156, line 14; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 65, lines 8-16; Ex. 1 at #11, 16, 20, 23, 28, 32, 35).

41.     Recycle Tech's February 18, 2010 press release stated, among other things that Green Building was a builder of green structures made of recycled materials.  (Ex. 4).  The press release did not disclose that Green Building had only been incorporated less than a month prior

to the press release and had never built or sold any completed container homes.  (Ex. 2; Ex. 1 at #4 and 7; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 238, lines 4-5).

42.     At most, Recycle Tech had three models, which were not made of recycled materials. (Ex. 11 Rojas Deposition Tr. at p 118, lines 18-25; p 119, lines 1-25; p 120, lines 1-25; p 125, lines 1-5).

43.     Recycle Tech's February 23, 2010 press release stated, among other things, the company had signed a binding letter of intent to build up to 50 homes in Haiti.  (Ex. 7).  The press release did not state that Recycle Tech was expected to fund the building of the 50 homes and that it had no ability to do so.  (Ex. 53; Ex. 54 Gonzalez March 2, 2012 Testimony Tr. at p 18, lines 19-25 – p 20, lines 1-23; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 149, lines 16-25 – pg. 150, line 3; Ex. 13 at #14 and 18).

44.     Recycle Tech never built any container homes in Haiti.  (Ex. 1 at #26).

45.     Recycle Tech's February 24, 2010 press release represented, among other things, Recycle Tech was "breaking ground" in a month's time "to showcase" its "container building in historical Overtown."  (Ex. 8).  The press release did not disclose that the Overtown project had not been approved or permitted by the required municipality and in fact was never funded or built.  (Ex. 55 Alain Gonzalez Deposition Tr. p 35, lines 11-25; p 36, lines 1-14; Ex. 56 Romney Deposition Tr. p 56, lines 12-15; p 63 line 23 – p 64 line 9; p 68, lines 2-12; Ex. 13 at #3).

46.     Recycle Tech's February 25, 2010 press release represented, among other things, that Recycle Tech was adding an award winning architect to its staff.  (Ex. 10).  The referenced architect, Gonzalez's uncle, was never an employee of Recycle Tech and did not consider himself on its staff. (Ex. 56 Romney Deposition Tr. at p 47, lines 17-19; p 34, lines 7-17).

47.     All seven of the press releases contained the same by-line that Recycle Tech now

will manufacture and deliver premium eco-friendly container homes, as well as LEED certified green homes, communities, buildings, and city structures across the world. (Exs. 4-10).

48.     In truth, Recycle Tech never had the staff, resources, or equipment to "manufacture and deliver premium eco-friendly Container Homes." (Ex. 1 at #8; Ex. 3 Gonzalez Nov. 4, 2010 Testimony Tr. at p 62, lines 11-25; p 105, lines 12-25; Ex. 11 Rojas Deposition Tr. at p 122, lines 10-15; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 235, lines 15-17; p 236, line 11 – p 237, line 5).

49.     Recycle Tech never sold or delivered any container homes. (Ex. 1 at #4 and 7; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 238, lines 4-5).

50.     Recycle Tech's model container homes were not LEED certified as advertised. (Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 165, lines 8-22; Ex. 11 Rojas Deposition Tr. at p 121, lines 20-25; p 122, lines 1-7).

51.     Gonzalez maintained and provided the content for Recycle Tech's website. (Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p. 100, line 10 – p 102, line 8).

52.     Gonzalez communicated with stock promoters regarding the promotional campaign via e-mail. (Ex. 57).

53.     Gonzalez later communicated with an investor in April 2010 and continued to misrepresent the status of Recycle Tech.  (Ex. 58).  When asked whether any container homes had been shipped out to Haiti, rather than answering truthfully that no homes had been sold or shipped to Haiti, Gonzalez states that Recycle Tech was in it for the long haul and that they were in the final stages of becoming a partner with UNICEF to provide many sustainable structures to Haiti very soon. (Ex 58; Ex. 12 Gonzalez Aug. 26, 2013 Deposition Tr. at p 116, line 18 – p 117 line 12).

D. **The Promotional Campaign Kicks Off and Penny Stock Promoters "Dump" Their Stock**

54.     Prior to initiating the promotional campaign, Thompson requested Sepe update Recycle Tech's information on Yahoo and Pinksheets.  (Ex. 59).  He also asked that Recycle Tech update its website with pictures which would be extremely helpful to "paint a picture…".  *Id*.

55.     The day the promotional campaign kicked off Halperin wrote to Thompson that the "chill is off" and "I think you owe her", referring to the transfer agent.  (Ex. 60).

56.     The same day Thompson and OTC began issuing their promotional newsletters regarding Recycle Tech stock, Thompson writes to Sepe and Halperin asking that they issue a Form 8-K for Recycle Tech and that Recycle Tech update its website with stock information.  He noted to Halperin and Sepe that he was already getting "love letters" from people performing due diligence on the company and calling it a "shell scam".  (Ex. 61).  Nevertheless, Thompson and OTC continued touting Recycle Tech stock and issued additional newsletters.  (Exs. 62-68).

57.     Thereafter, Gonzalez on behalf of Recycle Tech, submitted to the Commission a Form 8-K dated February 22, 2010 which did not include the audited financial statements of Green Building. (Ex. 69).

58.     On February 22, 2010, four days after Recycle Tech issued its first press release and the very same day Thompson received word his shares were cleared and ready to be traded, he began issuing the newsletters promoting Recycle Tech stock.   (Ex. 60; Ex 70; Ex 34 Thompson Deposition Tr. at p 204, lines 1-18; Exs. 71 - 78).

59.     Thompson had previously agreed to coordinate the release of his newsletters regarding Recycle Tech with Fung and another stock promoter. (Ex 79).

60.     Thompson also agreed to coordinate the promotional activity of Recycle Tech

with Sepe. (Ex. 37 at #4).

61.     Ultimately Thompson and his company OTC issued at least eight newsletters between February 22 and 24, 2010 promoting Recycle Tech.  (Exs. 62-67; Exs. 71-77).

62.     The disclaimers contained in the newsletters indicated Thompson and OTC "may" sell part or all of any such shares, when they knew they intended to sell all their shares during the touting campaign.  (Exs. 62 – 67; Exs. 71-77; Ex. 33 Thompson Testimony Tr. at p 54, line 7 – p. 55, line 7; p 57, line 21 – p 58, line 4).

63.     None of the newsletters disclosed Thompson and OTC Solutions' intent to sell the shares, actual sale of the shares, or specifically named the source of the stock received.  (Exs. 62-67; Exs. 70 – 77; Ex. 80).

64.     OTC and Thompson's February 22, 2010 newsletters were released to more than 30,000 subscribers and possibly as much as 100,000 subscribers.  (Exs. 71-78; Ex. 33 Thompson Testimony Tr. at p. 64, line 13 – p. 65, line 3).

65.     OTC and Thompson's newsletters issued on February 22, 2010 stated that Recycle Tech has a tremendous upside; Recycle Tech's container homes are highly popular; and Recycle Tech could be our next huge gainer. (Exs. 71-77).

66.     OTC and Thompson's February 24, 2010 newsletters were released to more than 100,000 subscribers.  (Exs. 62-68).

67.     OTC and Thompson's newsletters issued on February 24, 2010 stated that "many of our subscribers locked in substantial profits in one healthy trading day.  However, we believe that this is just the first leg of the race."  (Exs. 62-68). Meaning that there was potential for more gain and that there was a potential for the stock price to go up.  (Ex. 34 Thompson Deposition Tr. at p 165, line 21 – p 166, line 4). Thompson failed to mention he had already started selling his

own Recycle Tech stock. (Exs. 62-68; Ex. 70; Ex, 80).  The newsletters also predict that a 'hefty bounce to follow" which Thompson explained meant he expected the stock price to go back up. (Ex. 34 Thompson Deposition Tr. at p 168, line 9 – p 169, line 2).

68.    OTC and Thompson were aware that at least portions of their newsletters were circulated without any disclaimer, but took no action.  (Exs. 81-84; Ex 34 Thompson Deposition Tr. at p 174, lines 15-20; p 182, line 24 – p 183, line 21).

69.    By February 25, 2010 OTC and Thompson had sold all of their Recycle Tech shares for $441,722.  (Ex. 70, Ex. 80, Ex. 34 Thompson Deposition Tr. at p. 205, lines 2-19; Ex. 85 at #19; Ex. 86 at #19).

70.    Within days of completing the promotional campaign of Recycle Tech and making over $440,000, Thompson wrote to Halperin complaining about Recycle Tech's "weak news, inaccurate data on every informational site and unanswered phone calls when we are trying to get a game plan."  He went on to state, "News? – An LOI, a hired architect whoopie." (Ex. 87).

71.    Thompson and OTC have completed numerous promotional campaigns with Fung and Sepe.  (Ex. 37 at #2, 3, and 4).

**E.  <u>The Pump and Dump's effect on Recycle Tech's Stock Price and Volume</u>**

72.    In the days prior to the pump and dump scheme Recycle Tech's stock price stood at eleven cents per share.  (Ex. 88).

73.    On February 18, 2010, the day Recycle Tech issued its first press release, the company's trading volume jumped to 35,000 shares from 6,000 the previous day.  (Ex. 88).

74.    The day after the company issued its first press release, the stock volume soared to over 2 million shares. (Ex. 88).

75.     Over the next few days, with the addition of OTC and Thompson's newsletters, the stock volume increased to more than 18 million shares traded, with an intraday high of 27 cents per share.  (Ex. 88).

**F.   OTC and Thompson's Affirmative Defense of Reliance on Advice of Counsel Fails**

76.     OTC and Thompson allege they relied on advice of counsel when issuing the newsletters in question. (Ex. 89).  Thompson has identified the attorneys as Hank Gracin and Leslie Marlow. (Ex. 90 at #6 and 7).

77.     Gracin and Marlow did not provide advice regarding the Recycle Tech promotional campaign or newsletters issued by OTC and Thompson regarding Recycle Tech. (Ex. 26 Marlow Deposition Tr. at p 38, lines 1-6; p 43, line 19 – p 44, line 2; p 46, line 12 – p 49, line 24; p 82, lines 8-17; p 83, lines 8-13; Ex. 35 Gracin Deposition Tr. at p 53, lines 9-13; p 56, lines 2-16; p 57, lines 15- p 60, line 15; p 76, line 6 – p 78, line 17; p 79 line, 18 – p 80, line 1; p 96, line 21 – p 97, line 4; p 98, lines 9-15; p 101, line 24 - p 102, line 1; p 102, line 6 – 12; p 113, line 25 – p 114, line 4; p 115, line 17 – p 116, line 7).

78.     Gracin and Marlow did not review or approve the newsletters OTC and Thompson issued regarding Recycle Tech. *Id*.

79.     One month before the promotional campaign Gracin writes to Thompson asking that each deal be run by Marlow and stated that the disclaimer is not "one size fits all".  He also advised Thompson that if an affiliate or the company paid Thompson, then he should disclose who it is in the newsletter.  (Ex. 91).

80.     OTC and Thompson did not seek legal advice from Gracin and Marlow for every deal as requested by the attorneys. (Ex. 26 Marlow Deposition Tr. at p 38, lines 1-6; p 43, line 19 – p 44, line 2; p 46, line 12 – p 49, line 24; p 82, lines 8-17; p 83, lines 8-13; Ex. 35 Gracin

Deposition Tr. at p. 53 lines, 9-13; p 56, lines 2-16; p 57, line 15 - p 60, line 15; p 76, line 6 – p 78 line, 17; p 79, line 18 – p 80, line 1; p 96, line 21 – p 97, line 4; p 98, lines 9-15; p 101, line 24 - p 102, line 1; p 102, lines 6 – 12; p 113, line 25 – p 114, line 4; p 115, line 17 – p 116, line 7).

81.     Just one day before OTC and Thompson's Recycle Tech promotional campaign Gracin writes to Thompson that "the basic issue is that you are telling people to buy something while you are selling it. So I would be happier if we beefed up that part of your disclosure, especially if you are selling into the promotion with both hands (which I don't know if you are). To that end, can you show us a recent promotion and include all your sales and dates, so we can see the full picture?" (Ex. 92).

82.     Gracin and Marlow were not aware of when OTC and Thompson sold their Recycle Tech stock. (Ex. 26 Marlow Deposition Tr. at p 38, lines 1-6; p 43, line 19 – p 44, line 2; p 46, line 12 – p 49, line 24; p 82, lines 8-17; p 83, lines 8-13; Ex. 35 Gracin Deposition Tr. at p 53, lines 9-13; p 56, lines 2-16; p 57, lines 15- p 60, line 15; p 76, line 6 – p 78, line 17; p 79, line 18 – p 80, line 1; p 96, line 21 – p 97, line 4; p 98, lines 9-15; p 101, line 24 - p 102, line 1; p 102, line 6 – 12; p 113, line 25 – p 114, line 4; p 115 line, 17 – p 116 line 7).

Respectfully submitted,

December 9, 2013          By:      s/Christine Nestor
                                  Christine Nestor
                                  Senior Trial Counsel
                                  Fla. Bar No. 597211
                                  nestorc@sec.gov
                                  Direct Dial: (305) 982-6367
                                  Facsimile:  (305) 536-4154

                                  Attorney for Plaintiff
                                  SECURITIES AND EXCHANGE COMMISSION
                                  801 Brickell Avenue, Suite 1800
                                  Miami, Florida  33131
                                  Telephone:  (305) 982-6300

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 9, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                  s/Christine Nestor
                                  Christine Nestor, Esq.

14

## SERVICE LIST

SEC v. RECYCLE TECH, INC., et al.,
Case No. 1:12-cv-21656-JAL

James D. Sallah, Esq.
Jeffrey L. Cox, Esq.
Joshua A. Katz, Esq.
Sallah & Cox, LLC
2255 Glades Rd. Ste 300E
Boca Raton, FL 33431
Telephone: 561-989-9080
*Counsel for Jay Fung and Pudong LLC*
Via CM/ECF

Brent R. Baker, Esq.
D. Loren Washburn, Esq.
Aaron D. Lebenta, Esq.
Mark L. Smith, Esq.
Clyde Snow & Session
201 S. Main Street, 13th Floor
Salt Lake City, UT 84111
*Counsel for Anthony Thompson and OTC Solutions*
Via CM/ECF

Jeffrey A. Neiman, Esq.
100 Southeast Third Avenue
Suite 2612
Fort Lauderdale, Florida 33394
Telephone:  954-462-1200
*Counsel for Anthony Thompson and OTC Solutions*
Via CM/ECF

Ryan Gonzalez
8240 NE 8th Place
Miami, FL 33138
Service Via U.S. Mail on December 10, 2013